442 So.2d 919 (1983)
William B. JONES
v.
STATE of Mississippi.
No. 54611.
Supreme Court of Mississippi.
December 7, 1983.
Rehearing Denied January 11, 1984.
Ross Barnett, Jr., Barnett, Montgomery, McClintock & Cunningham, Jackson, for appellant.
Bill Allain, Atty. Gen. by Frankie Walton White, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before BROOM, P.J., and ROY NOBLE LEE and DAN M. LEE, JJ.
BROOM, Presiding Justice, for the Court:
Manslaughter is the offense for which appellant (William B. Jones, defendant herein) was convicted, in the Circuit Court of the First Judicial District of Hinds County, the Honorable William F. Coleman presiding. Trial was actually upon a murder indictment but resulted in the manslaughter, lesser offense, conviction, and sentence of twenty (20) years imprisonment. The unusual feature of the case is that the defendant's victim, his wife, Laura C. Jones, lived almost a year and a half after she was found severely beaten on November 9, 1980. Insufficiency of the evidence is the only ground argued for reversal. We affirm.
Facts of the case are briefly stated as follows: The deceased and defendant were first married in April, 1979, but they were divorced in a short time and remarried September 20, 1980. The deceased (Laura) was a nurse, and lived with the defendant in her small house in Clinton. Her daughter, Rebecca, in the late afternoon of November 9, 1980, found her sitting on the floor in the upstairs portion of the house with dried blood in her nose and ears. The house was in disarray with the phones having been pulled or cut loose. An ambulance was called which carried Laura to Hinds General Hospital, where she was treated. Subsequently she was in a nursing home at intervals until death on April 30, 1982. At trial the defendant admitted that on the occasion in question he and his wife, Laura, had an altercation in which he struck her some five or six times with his hand, which he said was in self-defense. Other testimony will be related in discussing the assignment of error.
Sole proposition argued by the defendant is his contention that the verdict "is contrary to the overwhelming weight of the evidence".
Testifying in his own defense, the defendant stated that he was 47 years old, father of three children by a former marriage, and that he last saw Laura on Friday night, November 7, 1980, when he left her standing at the top of the stairway. (She was found injured, semi-unconscious on Sunday, November 9, 1980). His version is that when he came home on Friday afternoon November 7, 1980, his wife began to curse him, berate him, and threaten to have her former husband, T.T. Dearing, and also some "big fellow" stomp him and kill him. He said that when she was on the telephone *920 he jerked the cord from the wall, after which she went upstairs and he followed her. Upstairs he said that she jerked the phone from the wall and in the process turned over the coffee table, spilling its contents on the floor and breaking a glass on top of it. Then he said she kicked him and scratched him and tried to choke him. He said that she also bit him and finally he slapped her with the palm of his hand some five or six times, after which he left. At that point, she was standing at the top of the stairway throwing his clothes after him. Upon deciding to move out, Jones returned to the house, approximately an hour later, and picked up the clothes. Laura again came to the top of the stairway, whereupon Jones left and never saw her again.
Testifying in his behalf were a number of character witnesses who established that he enjoyed a good reputation. He also presented testimony of others who saw scratches on him.
First doctor to see Laura after her admission into the hospital on November 9, 1980, was Dr. Eugene Wood, who stated that she was comatose and "her eyes were swollen; her face was bruised; she had markings on the upper neck in the submandibular area. She had blood  dried blood in her right ear." Brain scans were done on Laura, as shown from the following excerpted from Dr. Woods' testimony,
Q And what type of brain injury did the brain scan show?
A The brain scan showed an enlargement of the ventricles and some loss or widening of what is call (sic) convolutions of the brain, which usually indicates brain injury and brain  I don't like the word used, brain death  but say brain injury anyway. Something similar that you would see in boxers' brains sometimes when they've had repeated trauma.
Q Her brain had some things consistent with what you see in a boxer 
A Trauma, yes. They felt it was consistent with an electroencephalogram showed consistent with anoxia or loss of oxygen to the brain.
After her death, Laura's body was autopsied by Dr. Rodrigo Galvez, from whose testimony the following is excerpted:
Q As a result of this autopsy, were you able to determine to a reasonable medical certainty what the cause of death was?
A Yes, sir. Her brain  her brain show (sic) many areas of necrosis  what we call necrosis is many dead parts of the brain. Okay? Those  those changes of the necrosis in the brain took place sometime before. I couldn't tell you exactly how long, whether it was three months or a year because beyond three months, it's very difficult to tell the exact time of necrosis. Now 
Q Now, Dr. Galvez, necrosis could also be defined in layman's terms as at least partial brain death, can it not?
A Yes. That's what the laymen call brain death or brain necrosis. Okay?
Q Now, from your autopsy, were you able to determine again to a reasonable medical certainty as to what caused the brain necrosis?
A Yes, sir. She had also evidence of bilateral subdural bleeding long time before. That was caused by a blunt trauma in perhaps more than one, but at least one blow to the head  one blow to the head. As a result of the bleeding inside the head, she stopped breathing. When she stopped breathing, a part of the brain died. When part of the brain died, she couldn't feel or eat or talk or move like other human beings and she had to be fed by tube. A tube was put through the mouth down to the stomach so she could be fed by tube. And the final event in the life of the woman was gastric bleeding, what we call a hemorrhagic gastritis. Okay? Hemorrhagic gastritis. And that's what caused the death of this woman.
Pictures in the record show that the house after the altercation between the defendant and Laura was in great disarray with items scattered all about. Testimony showed that Laura, the deceased, was a small woman: 5 ft. 1 in. in height and 107 *921 pounds in weight. Testimony further established that 4 telephones were in the house and all of them were either pulled out or cut loose and inoperable. When Rebecca found her mother, she was dressed in a slip, robe and white nursing stockings (she was a nurse by profession), with her nurse's uniform in a corner. Scattered about on the floor were buttons from her nurse's uniform.
Other testimony established that there was considerable ill-feelings between the defendant and Laura's former husband. Further the testimony established that Laura's two grown daughters by her prior marriage did not have any congeniality or friendly attitudes toward the defendant.
All of this evidence went to the jury and the jury concluded that the defendant's version of slapping Laura in self-defense was not plausible or acceptable to them. Instead of finding him guilty of murder, the jurors found the defendant guilty of the lesser included offense of manslaughter, and we cannot say that the jury verdict was unsupported by the evidence. The evidence which went to the jury, together with reasonable inferences which the jurors were entitled to draw from the testimony, including the defendant's testimony that he slapped Laura with his hand some five or six times, established his guilt of manslaughter and we find no reversible error.
AFFIRMED.
PATTERSON, C.J., WALKER, P.J., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.